## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) JAMES FERGUSON, individually and on Behalf of all others similarly situated, | ) ) ) | |
| (2) PATRICK FERGUSON, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No.:   19-cv-633-JED-JFJ |
| v. | ) ) | JURY TRIAL DEMANDED |
| (1) POTTERY BARN, INC., | ) ) | |
| (2) WILLIAMS-SONOMA, INC., | ) ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW Plaintiffs James Ferguson and Patrick Ferguson ("Plaintiffs"), and all individuals similarly situated ("Putative Class Members"), by and through their attorneys of record, and for their Complaint against the above-named Defendants, state as follows:

## INTRODUCTION

1.      Baby Crib Bumpers ("Bumpers") are popular products designed to wrap around the bottom perimeter of a baby's crib, purportedly to prevent babies from becoming trapped between the slats of the crib and for cushioning on the sides of the crib. Bumpers are often marketed and sold with other baby bedding products, such as sheets and mattresses, reinforcing the idea that they are to be used while a baby is sleeping. Descriptions of many Bumpers include phrases such as, "ULTIMATE PROTECTION FOR YOUR BABY" or "keeps tiny arms and toes safely inside the crib." Tragically, however, Bumpers are not safe for infant sleep as the manufacturers and retailers have represented to the public. In fact, between 1985 and 2012, Bumpers were possibly involved in at least 77 infant deaths and at least 25 non-fatal injuries. The causes of these deaths include suffocation on the Bumper itself and strangulation by the ties holding Bumpers to the crib. Both

the American Academy of Pediatrics ("AAP") and the US Consumer Products Safety Commission ("CPSC") recommend that parents avoid using Bumpers on their babies' cribs.

2.     As early as 2007, the Journal of Pediatrics noted that Bumpers are extremely unsafe and can lead to Sudden Infant Death Syndrome ("SIDS"). Despite this alarming information, Bumpers remain extremely popular and are sold at nearly every retailer, both at brick and mortar stores and online, that sells baby products. While some retailers have recently added warnings and/or disclaimers to their Bumpers, the AAP has stated that no Bumpers are completely safe, regardless of their design or the materials that comprise them.

3.     Defendants knew about these risks for as long as they sold Bumpers.  Among other things, (1) the AAP and major consumer groups repeatedly issued warnings about the serious dangers of Bumpers; (2) At least one major retailer, Wal-Mart, has already been sued for at least one infant death caused by Bumpers, which resulted in Wal-Mart ceasing to sell that brand/model of Bumpers; (3) at least 77, and likely more, deaths have occurred in babies whose cribs had Bumpers; and (4) dozens, if not hundreds, of non-fatal injuries have occurred to babies whose cribs had Bumpers. Ignoring documented safety concerns, Defendants marketed and sold Bumpers in the United States as safe crib accessories that are suitable for all night and prolonged sleep.

## PARTIES

4.     Plaintiff James Ferguson ("J. Ferguson" or "James") is a citizen of Tulsa County in the State of Oklahoma.  In or about 2019, he purchased a set of Bumpers from Pottery Barn Kids in Tulsa, OK for his son, Patrick Ferguson ("P. Ferguson" or "Patrick"), whose wife was approximately four months pregnant with their second child at the time. Patrick and his wife attempted to install the Bumpers on their crib but had trouble keeping the Bumpers attached properly. When Patrick and his wife attempted to return the Bumpers, which were manufactured by Pottery Barn, Inc., Pottery Barn Kids would not accept the return. James was induced to

purchase Pottery Barn, Inc.'s Bumpers by Pottery Barn's marketing that Bumpers are a safe crib accessory that serve to protect babies while they sleep.

5.      Patrick Ferguson is the son of Plaintiff James Ferguson. Patrick is currently a resident of Tulsa County, Oklahoma. In 2018, Patrick was a resident of Modesto, California, where he purchased a set of Bumpers for his first child at Babies "R" Us. Patrick attempted to install the Bumpers, manufactured by DwellStudio, on his child's crib, but the Bumpers repeatedly fell off of the crib after installation. Patrick attempted to return the Bumpers to Babies "R" Us but the retailer did not accept the return. Patrick was induced to purchase the DwellStudio crib bumpers because both DwellStudio and Babies "R" Us marketed them as a safe crib accessory that serve to protect babies while they sleep.

6.      Defendant Pottery Barn, Inc. is a Delaware corporation and wholly-owned subsidiary of Defendant Williams-Sonoma, Inc. headquartered in San Francisco, California. Defendant Pottery Barn operates approximately 200 stores in the United States. Pottery Barn also operates several specialty stores under the titles Pottery Barn Kids and PBteen. Defendant Pottery Barn, Inc. operates a Pottery Barn store and Pottery Barn Kids store in Tulsa, OK.

7.      Defendant Williams-Sonoma, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Williams-Sonoma, Inc. is the parent company of Defendant Pottery Barn, Inc.

8.      The Putative Class members, as defined below, are citizens of various states that have purchased baby crib bumpers sold and/or manufactured by Defendants from 2008 to present.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiffs' claims under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because, upon information and belief, there are 100 or more class members, at least one class member is a citizen of a state that is diverse from each

Defendant's citizenship, and, upon information and belief, the amount in controversy exceeds $5 million exclusive of interest and costs.

10.     This Court has personal jurisdiction over Defendant Pottery Barn, Inc. because it purposefully availed itself of the privilege of conducting business in the State of Oklahoma; because it transacts business, and supplies good and services in the State of Oklahoma; because it committed tortious acts that caused injury to persons within the State of Oklahoma; and because there is a substantial relationship between Plaintiff James Ferguson's claims and Oklahoma transactions involving Pottery Barn, Inc.

11.     This Court has personal jurisdiction over Defendant William-Sonoma, Inc. because it purposefully availed itself of the privilege of conducting business in the State of Oklahoma; because it transacts business, and supplies good and services in the State of Oklahoma; because it committed tortious acts that caused injury to persons within the State of Oklahoma; and because there is a substantial relationship between Plaintiff James Ferguson's claims and Oklahoma transactions involving William-Sonoma, Inc.

12.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

13.     The US Consumer Product Safety Commission ("CPSC") maintains files on cases voluntarily reported to them of deaths and injury related to commercial products. A study published in the Journal of Pediatrics in 2007 reviewed infant deaths between 1985 and 2005 related to crib bumpers by searching the CPSC's database for crib-related injuries that potentially might have been attributed to Bumpers.[1]

---

[1] The study, Deaths and Injuries Attributed to Infant Crib Bumper Pads, can be found at https://www.jpeds.com/article/S0022-3476%252807%252900363-0/fulltext.

14.     The study found that twenty-seven (27) accidental deaths reported by medical examiners or coroners were attributed to bumper pads. Further, the study found twenty-five (25) nonfatal injuries that were attributed to bumper pads. The authors of the study concluded that ***all retail bumpers had hazardous properties and that bumpers should not be used.***[2]

15.     The authors of the study noted that since the deaths they studied were voluntarily reported to the CPSA, "[t]hese cases represent an unknown fraction of total occurrences."[3]

16.     After publishing their 2007 study, the authors called on the CPSC to restrict use of Bumpers, but the CPSC took no action.

17.     The American Academy of Pediatrics ("AAP") periodically updates its guidelines regarding safe sleeping environments for infants so as to prevent Sudden Infant Death Syndrome ("SIDS"). In 2012, the medical journal American Family Physician ("AFP") published an article that discussed recent updates to AAP's guidelines regarding safe sleeping environments for infants.[4] The AAP recommended: placing infants in the supine position (on the infant's back), on a firm mattress simply covered by a fitted sheet, and removing all soft objects, loose bedding, and similar items from the infant's crib. The AAP also recommended against placing bumper pads or similar products in an infant's crib, as "they may increase the risk of suffocation, strangulation, and entrapment."[5]

18.     In February of 2016, the authors of the 2007 study regarding infant deaths caused by Bumpers published a new study in the Journal of Pediatrics, titled Crib Bumpers Continue to Cause Infant Deaths: A Need for a New Preventative Approach.[6] The authors again studied the

---

[2] *Id.*
[3] *Id.*
[4] The article, AAP Expands Recommendations on SIDS and Other Sleep-Related Deaths, can be found at https://www.aafp.org/afp/2012/0501/p918.html.
[5] *Id.*
[6] https://www.jpeds.com/article/S0022-3476(15)01284-6/abstract

CPSC database of infant deaths classified by mechanism, with an expanded temporal scope of January 1985 to October 2012. They found that there were three times more deaths attributed to Bumpers in the previous seven years than had occurred in the three previous time periods. The authors concluded Bumpers caused 48 suffocations, 67% by a Bumper alone, and 33% by wedgings between a Bumper and another object.[7] The authors then compared the number of deaths reported to the CPSC with those from the National Center for the Review and Prevention of Child Deaths ("NCRPCD") from 2008-2011. The result was an increase to 77 total infant deaths attributed to Bumpers. The authors concluded that the supposed benefits proffered by manufacturers and retailers of Bumpers "were not supported by the data."[8] Further, the study noted that since the deaths were voluntarily reported, it was likely that more deaths had occurred due to Bumpers.

19.    In November 2016 the AAP updated their guidelines for a safe sleeping environment for infants again. Notably, the AAP stated that "[b]ecause bumper pads have been implicated as a factor contributing to deaths from suffocation, entrapment, and strangulation, and because they are not necessary to prevent head entrapment with new safety standards for crib slats, they are not recommended for infants."[9]

20.    The data linking Bumpers to infant deaths is so clear that various cities and states have begun regulating them due to a lack of federal action. The city of Chicago, Illinois banned Bumpers in 2011 over fervent objections from retailers and manufacturers. The state of Maryland banned Bumpers in June 2013, while the state of Ohio banned Bumpers in 2017.

---

[7] *Id.*

[8] *Id.*

[9] SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment:
https://pediatrics.aappublications.org/content/138/5/e20162938?utm_source=highwire&utm_medium=email&utm_campaign=Pediatrics_

21.     In May 2017 the CPSC issued a statement regarding the dangers of crib bumpers. The statement was attached to a report the CPSC authored that itself was a follow-up to a September 2016 CPSC staff report that found 107 fatal and 282 nonfatal incidents from January 1990 to March 2016 associated with Bumpers.[10]

22.     The 2017 report identified six additional hazards associated with padded bumpers: they limit space on the mattress, the cover key failure points on the crib, they are difficult to install, they are used with children older than the recommended age, they are used outside cribs, and their use sends mixed messages about padded objects in cribs.[11]

23.     The report marked the first time the CPSC considered blocking the use of Bumpers. However, Dr. Rachel Moon, lead author on the AAP's safe sleep policy statement, noted that it would likely take years for the CPSC to develop meaningful regulations for Bumpers, and therefore the AAP continued to support a full ban on them.[12]

24.     Nonetheless, vast numbers of retailers and manufacturers of Bumpers have continued to market them as safe crib accessories, despite the substantial amount of credible data and research that have explicitly demonstrated the severe dangers caused by Bumpers.

25.     These retailers and manufacturers, including Defendants, have made great efforts to deceive potential buyers of Bumpers by downplaying and/or discrediting the studies linking Bumpers and infant deaths. The retailers and manufacturers, including Defendants, have also deceived purchasers of Bumpers by engaging in misleading marketing campaigns and displaying deceptive and/or false labels on Bumpers that portray them as being not only free of risk of harm, but also as products that actively improve the safety of the infant.

---

[10] https://www.aappublications.org/news/2017/05/19/Bumpers051917
[11] The full report can be found at https://www.cpsc.gov/s3fs-public/CBStatement.pdf?dhFXWQNHUqQ2yV4xuY654JrJ3K0Towc
[12] https://www.aappublications.org/news/2017/05/19/Bumpers051917

26.     Retailers and manufacturers, including Defendants, have also engaged, and continue to engage, in marketing campaigns that promote Bumpers as aesthetically pleasing additions to the decor of an infant's bedroom. Bumpers come in myriad colors and designs, and consumers are encouraged to buy multiple sets to match different sets of bedding.

27.     Defendants failed to give consumers, including Plaintiffs, adequate warnings of the dangers Bumpers pose to the health and safety of their infants if left in the crib during prolonged sleep, including overnight sleep.

28.     From at least 2008 to present, Defendant Pottery Barn, Inc., including but not limited to its subsidiaries Pottery Barn Kids and PBteen, has manufactured and sold numerous types of Bumpers, including the models purchased/owned by Plaintiffs, in stores throughout the United States, including in Oklahoma.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

**Continuing Act Tolling**

29.     Defendants have been manufacturing, marketing, and selling Bumpers for many years – since at least 2008. During this timeframe, Defendants have continuously marketed and sold dangerous Bumpers to unsuspecting parents and caregivers of infants. They continuously represented these Bumpers as safe accessories to cribs that help secure infants during all-night or prolonged sleep.  By continuously repeating these false representations, and failing to disclose that Bumpers were defectively designed and exposed infants to great risk of injury and death, Defendants engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Defendants might seek to apply.

30.     Defendants' knowledge of the defects is evidenced by, *inter alia*: numerous complaints by consumers of injury and death; by warnings from the AAP and major consumer groups; by a lawsuit against Wal-Mart for an infant's death caused by Bumpers; and by Chicago,

Maryland, and Ohio's bans on Bumpers.

31.     Thus, Defendants indisputably possessed continuous knowledge of the dangers posed by Bumpers, and, yet, they inexplicably continued to repetitiously market and sell them as safe products for overnight and prolonged sleep.  Plaintiffs' and other Class members' claims are not time barred.

**Fraudulent Concealment Tolling**

32.     Defendants had a duty to disclose to Plaintiffs and the Class members the true quality and nature of the Bumpers, that Bumpers have uniform defect, and that Bumpers pose significant safety concerns.

33.     This duty arose due to, *inter alia,* their representations that Bumpers are safe to use in cribs.

34.     Defendants have known at all relevant times of the risks that its Bumpers pose to infants.  Prior to selling Bumpers, Defendants knew or should have known about the AAP's 2005 recommendations concerning safe sleep, which state that babies should sleep flat on their backs in an empty bassinet or crib, with no soft blankets or other objects.  As of 2011, Defendants knew or should have known that the AAP expanded on those warnings. Defendants also knew or should have known about the 2007 and 2012 studies linking Bumpers to infant deaths. Defendants also knew or should have known that various cities and states, such as Chicago, Maryland, and Ohio, have banned Bumpers due to safety concerns.  And, finally, in 2016, Defendants knew or should have known when the AAP further expanded on its recommendations.

35.     Despite their knowledge of the defective design and danger of Bumpers when used as intended, Defendants failed to disclose and concealed this material information from Plaintiffs and other Class members, and instead they continued to market the Bumpers as safe for overnight and prolonged infant sleep.

36.     The purpose of Defendant's concealment of the dangers was to prevent Plaintiffs and other Class members from seeking redress.

37.     Plaintiffs and the other Class members justifiably relied on Defendants to disclose the true nature of the products they purchased and/or owned because the defects were not discoverable by Plaintiffs and the other Class members through reasonable efforts.

38.     Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**ESTOPPEL**

39.     Defendants were under a continuous duty to disclose to Plaintiffs and the other members of the Class the facts that it knew about the dangers Bumpers pose to infants.

40.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Bumpers from Plaintiffs and other members of the Class.

41.     Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**CLASS ACTION ALLEGATIONS**

42.     Plaintiffs bring this action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of following "Class":

43.     All persons who purchased or owned any crib bumper pads manufactured or sold by William-Sonoma, Inc., Pottery Barn, Inc. and/or Pottery Barn Kids from 2008 to present.

44.     The Class is so numerous that joinder of all members is impracticable. The Class numbers more than a thousand members.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

46.     Plaintiffs' claims are typical of the claims of the other members of the Class

because, inter alia, all Class members were injured through the uniform misconduct described above, and all Class members were subject to Defendants' deceptive statements, including deceptive claims that accompanied each and every set of crib bumpers that was sold concerning its suitability for prolonged or overnight sleep.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

47.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs are represented by counsel skilled and experienced in complex civil litigations, including class actions. Plaintiffs' counsel is accustomed to handling substantial litigation matters.

48.     Plaintiffs' and Plaintiffs' counsel have no interests that conflict in any way with those of Class members.

49.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Such common questions of law or fact include, *inter alia*:

50.     Whether Defendants' claims about crib bumpers being safe and suitable for prolonged or overnight sleep are reasonably likely to deceive;

51.     Whether Defendants engaged in unfair and/or deceptive advertising in marketing the product as a crib accessory that was suitable for prolonged or overnight sleep;

52.     Whether Defendants' misconduct constitutes a breach of the warranties that exists between Defendants and Plaintiffs and the other members of the Class;

53.     Whether Defendants have been unjustly enriched;

54.     Whether Plaintiffs and the members of the Class have been injured by Defendants' misconduct;

55.     Whether Plaintiffs and the members of the Class are entitled to relief, and the

amount and nature of such relief.

56.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, economies of scale and comprehensive supervision by a single court strongly weigh in favor of resolution on a class basis.

**COUNT I**
**VIOLATION OF OKLAHOMA DECEPTIVE TRADE PRACTICES ACT**
**(15 O.S. §§ 751 ET. AL.)**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

57.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

58.     This cause of action is brought pursuant to Oklahoma Consumer Protection Act, 15 O.S. §§ 751 et al. ("OCPA"), which prohibits deceptive acts or practices in the course of any business in Oklahoma.

59.     15 O.S. § 761.1(A) provides aggrieved consumers a private right of action for damages, including but not limited to, attorney's fees.

60.     Defendants design, manufacture, marketing, advertising, labeling, and/or sale of the crib bumpers constitutes Defendants' course of business.

61.     The Defendants' conduct alleged herein violates the OCPA in that Defendants engaged in the unfair acts and deceptive practices as described herein, which included marketing directed at Plaintiffs and the Class, conveying, on the boxes containing the Bumpers and

elsewhere, the message that the Bumpers are appropriate for overnight sleep and prolonged sleep, and the message that the use of Bumpers is known to be generally safe.  Defendants' marketing and sale of the product omitted adequate warnings concerning the danger of death and injury associated with the use of Bumpers.  Defendants' representations and omissions concerning the product were deceptive, false and misleading given the dangers of Bumpers described herein. Such conduct is inherently and materially deceptive and misleading in a material respect, which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

62.     The materially misleading statements and deceptive acts and practices of Defendants alleged herein were directed at the public at large, in Oklahoma and across the United States.

63.     Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances.

64.     Defendants' violation of the OCPA was willful and knowing.  As described above, at all relevant times, Defendants, among other things, knew that their Bumpers had caused many infant deaths and injuries, and that the AAP, as well multiple other pediatric professionals and consumer groups, recommended they not be used on infants' cribs, and that certain other cities and states had prohibited them from being sold. Nonetheless, Defendants continued to sell the products in the United States advertising their use for overnight and prolonged sleep in order to increase their own profits.

65.     As a result of Defendants' deceptive and misleading acts, Plaintiffs and the members of the Class have been injured because they purchased and/or owned Bumpers based on Defendants' representations and without full disclosure of all the material facts discussed above.

66.     As a result of Defendants' conduct in violation of the OCPA, Plaintiffs and the

members of the Class have sustained damages in amounts to be proven at trial because if Defendants had disclosed the information discussed above about the Bumpers and otherwise been truthful about their safety, Plaintiffs would not have purchased and/or received Defendants' product.  Defendants were also able to charge more than what their Bumpers would have been worth had they disclosed the truth about them.

67.     As a result, pursuant to the OCPA, Plaintiffs and the Class are entitled to make claims against Defendant for actual damages to be determined at trial, but not less than fifty (50) dollars per Class member.

68.     Additionally, pursuant to the OCPA, Plaintiffs and the Class make claims for attorneys' fees, costs.

69.     Plaintiffs further demand punitive damages on their own behalves and on behalf of the Class.

**COUNT II**
**BREACH OF WARRANTY**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

70.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

71.     The Bumpers described herein are "goods" as defined in Oklahoma's Commercial Code governing the implied warranty of merchantability. 12A O.S. § 2-105. Defendants are "merchants" as defined under the Oklahoma Commercial Code.

72.     Defendants created express and implied warranties that the Bumpers were in merchantable condition and merchantable quality.

73.     Defendants created express and implied warranties that the Bumpers were appropriate for the particular purposes for which Plaintiffs and Class Members purchased and/or received them (i.e., safe to wrap around a crib for an infant's prolonged or overnight sleep, and

generally safe).

74.     By placing their Bumpers in the stream of commerce, Defendants impliedly warranted that the Bumpers were reasonably safe, and that all claims in their advertising and marketing of the Bumpers were true, including that the Bumpers are safe and reliable.

75.     As a merchant, Defendants knew that consumers, including Plaintiffs and the Class, relied upon Defendants to design, label, and sell products that were reasonably safe and not deceptively marketed, and in fact members of the public, including Plaintiffs and the Class, reasonably relied upon the skill and judgment of Defendants and upon said express and implied warranties in purchasing the Bumpers.

76.     Defendants breached the express and implied warranties because, contrary to Defendants' claims, both in marketing schemes and labels, Bumpers serve no beneficial safety purposes for infants, and actually cause significant safety risks when used for their intended purpose.

77.     The Bumpers are dangerous in that they are of such a character that when used in their expected manner it is likely to be a source of potential death and injury to babies.

78.     Plaintiffs and members of the Class are among those intended to be ultimate consumers of Bumpers.

79.     At all times that Defendants warranted and sold the Bumpers, they knew or should have known that its warranties were false, and yet they did not disclose the truth in a timely manner or stop manufacturing or selling the Bumpers, and instead continued to issue false warranties. It is thus not required, and would be futile, for Plaintiffs to provide Defendants further opportunity to cure their breach.

80.     As a direct and proximate result of Defendants' breaches of warranties, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

**COUNT III**
**NEGLIGENCE**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

81.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

82.     Defendants owed a duty to Plaintiffs and Class members to exercise reasonable care in designing, manufacturing, and marketing products for infant use.

83.     Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

84.     Defendants also owed a duty to disclose the material fact that Bumpers were defective and dangerous, and unfit and inherently unsafe for their intended use.

85.     But for Defendants' breaches of their duties, Class members would not have purchased, owned, and/or continued to use the defective Bumpers or would not have paid as much for them as they did, and would not have exposed their infants to the risk of death or injury.

86.     Plaintiffs and Class members were foreseeable victims of Defendants' wrongdoing. Defendants knew or should have known that their Bumpers would cause damages to Class members.  The damages to Plaintiff and the Class members are a proximate, reasonably foreseeable result of Defendants' breaches of their duties.

87.     Therefore, Plaintiff and Class members are entitled to damages in an amount to be proven at trial

**COUNT IV**
**GROSS NEGLIGENCE**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

88.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

89.     Defendants owed a duty to Plaintiff and Class members to exercise reasonable care

in designing, manufacturing and marketing products for infant use.

90.     Defendants also owed a duty to Class members to detect and address major defects in a timely manner.

91.     Defendants also owed a duty to disclose the material fact that Bumpers were defective and dangerous, and unfit and inherently unsafe for their intended use.

92.     Defendants knew or should have known that Plaintiffs and other Class members were relying on them to manufacture, market and label the Bumpers with reasonable care, and that consumers reasonably and foreseeably relied on them to do so.

93.     Defendants grossly failed to exercise due care, and acted in reckless disregard of their duties, and thereby injured Plaintiffs and all members of the Class.  Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any entity selling products for infant use.  Although they knew that Bumpers could cause and had caused many infant deaths and injuries, and that the AAP as well multiple other pediatric professionals and consumer groups recommended they not be used in infants' cribs, and that certain other cities and states in the United States had prohibited them from being sold, Defendants continued to sell the products in the United States for use in infants' cribs.  Defendants knowingly allowed further tragedy to occur so that they could continue reaping profits.

94.     Defendants failed to exercise even slight or scant care and/or their conduct evinces a reckless disregard for the rights of others and/or is redolent of intentional wrongdoing.

95.     If Defendants had not been grossly negligent with respect to the manufacture, marketing, labeling and/or sale of the Bumpers, Plaintiff and other Class members would not have purchased and/or owned the Bumpers.

96.     As a direct and proximate result of Defendants' gross negligence with regard to the Bumpers, Plaintiffs and the Class have been harmed.

**COUNT V**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

97.     Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

98.     As a result of Defendants' material, deceptive advertising, marketing and/or sale of the Bumpers, Defendants were enriched at the expense of Plaintiffs and all other Class members through their purchase of the Bumpers, because the Bumpers do not provide the benefits as represented and expose their children to greater and more serious risks than represented.

99.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits they received from Plaintiffs and the Class as the result of their deceptive marketing and advertising practices.   Thus, it would be inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class.

**COUNT VI**
**FRAUD**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

100.    Plaintiffs incorporate by reference and re-allege herein all paragraphs alleged above.

101.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants.

102.    This claim is based on fraudulent representations and omissions concerning the safety of consumers who use the Bumpers. As discussed above, Defendants failed to disclose the risks associated with the intended use of the Bumpers, or that the risks were substantially likely to manifest through the customary and intended use of the Bumpers. Defendants also represented the Bumpers as safe to use in infants' cribs while the infants slept overnight/for a prolonged period, which the Bumpers were not.

103.    The false and misleading representations and omissions were made with knowledge of their falsehood. Defendants knew of medical guidelines and knew of consumer and other reports of the Bumpers' dangerous nature. Nonetheless, Defendants continued to sell their worthless and dangerous Bumpers to unsuspecting consumers.

104.    The false and misleading representations and omissions were made by Defendants, upon which Plaintiffs and members of the proposed Class reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and members of the proposed Class and to purchase the Bumpers.

105.    The fraudulent actions of Defendants caused damage to Plaintiffs and members of the proposed Class, who are entitled to damages and other legal and equitable relief as a result

**COUNT VII**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

106.    As a result of Defendants' misleading and fraudulent actions and omissions, Plaintiffs and the Class are entitled to declaratory relief, as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of their misconduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful, and ordering Defendants to engage in a corrective advertising campaign to place victims of their misconduct on notice of the availability of a full refund.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request relief against Defendants as set forth below:

1. Certifying the proposed Oklahoma Class;

2. Appointing Plaintiffs as Class representatives and their undersigned counsel as Class counsel;

3. Awarding Plaintiffs and the proposed Class members damages;

4. Awarding punitive damages to the extent permitted under Oklahoma and other applicable law;

5. Awarding restitution and disgorgement of Defendants' revenues to Plaintiffs and the proposed Class members;

6. Awarding declaratory relief as permitted by equity, including directing Defendants to identify, with Court supervision, the victims of their misconduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be unlawful;

7. Ordering Defendants to recall and cease selling all Bumpers in the United States;

8. Ordering Defendants to engage in a corrective advertising campaign;

9. Awarding attorneys' fees and costs; and

10. Granting such additional relief as the Court deems just and proper

## JURY TRIAL DEMANDED

Plaintiffs demands a jury trial on all issues so triable.

Dated:  November 21, 2019                          Respectfully submitted,

*/s/* Daniel E. Smolen
Daniel E. Smolen, OBA No. 19944
Lauren Lambright, OBA No. 22300
Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
(918) 585-2667 (telephone)
(918) 585-2669 (fax)
danielsmolen@ssrok.com
laurenlambright@ssrok.com
sterlingsims@ssrok.com

Mark A. Smith, OBA No. 31231
Caruso Law Firm, P.C.
1325 East Fifteenth Street, Suite 201
Tulsa, Oklahoma 74120
(918) 583-5900 (telephone)
(918) 583-5902 (fax)
msmith@carusolawfirm.com

*Attorneys for Plaintiff*s